Tolerton v. McLain.

Tolerton & Stetson Company et al., appellees, v.
George W. McLain et al., appellees, Im-
pleaded with German-American Savings Bank
of Le Mars, Iowa, appellant.

[Filed November 23, 1892.]

Creditor's Bill: Collateral Pledge of Partnership Notes
to Secure Individual Debt: Rights of Firm Creditors
Against Pledgee With Notice. M. and H., doing business
at C. under the name of M., sold their business and stock, tak-
ing the notes of the purchasers payable to M. M. sold one of
the notes to a bank and indorsed the same. He also delivered
to the bank other firm notes to secure his private indebtedness.
In a creditor's bill by creditors of the firm to subject the latter
notes to payment of the firm debts, held, that the proof clearly
showed that the officer of the bank taking the notes as security
for a personal debt of M., a member of the firm, knew that they
belonged to the partnership and that the creditors of the firm
were entitled to the proceeds of such notes.

Appeal from the district court for Dawes county.
Heard below before Kinkaid, J.

*Ira T. Martin, Barnes & Tyler*, and *Jenckes & Bane*, for
appellant.

*Alfred Bartow, Spargur & Fisher, W. H. Fanning, E.
S. Ricker*, and *A. W. Crites*, for appellees.

Maxwell, Ch. J.

It is claimed that on or about the 1st of April, 1890, one
G. W. McLain borrowed from the German-American
Savings Bank of Le Mars, Iowa, the sum of $600. As
security for such loan he pledged and delivered to the bank
certain promissory notes, executed by other persons, which
on their face were payable to him, amounting to about
$1,000. Afterwards, and during the month of June of the

same year, McLain again obtained from appellant $665, $1,200, and $1,702.50, executing his several notes for the above mentioned sums, and as security therefor, and for the payment of some notes of his which had been executed prior to that date, pledged certain promissory notes executed by Manning & Gorton, payable to the order of said G. W. McLain, at the Bank of Crawford, at Crawford, Neb. At the same time he sold one of the Manning & Gorton notes to the bank outright. All of the above security notes were duly indorsed by him and delivered to the appellant herein. When the notes became due, on or about October, 1890, the appellant forwarded the same by way of the Wells, Fargo & Co.'s Express to the Bank of Crawford for collection. Thereupon the appellees, The Tolerton & Stetson Company and others, commenced actions in the several courts of Dawes county against G. W. McLain, at the same time suing out writs of attachment and causing the Wells, Fargo & Co.'s Express to be served with notices of garnishment. Such proceedings were had in the several cases that judgments were obtained against G. W. McLain, and the answer of the garnishee was taken.

On or about the 1st day of November, 1890, all of the appellees joined in a suit in the nature of a creditor's bill against G. W. McLain, Henry Henrichs, The Wells, Fargo & Co.'s Express, The German-American Savings Bank of Le Mars, Iowa, appellant herein, and T. E. Bradway, and filed their petition in the district court of Dawes county, alleging, in substance, that G. W. McLain and Henry Hen richs prior to that time had been doing business at Crawford, Nebraska, as copartners; that the several judgments which the plaintiffs had obtained as above stated were against the said firm of G. W. McLain and Henry Henrichs; that the said firm was insolvent and that executions on said judgments had been returned unsatisfied; that the notes pledged by the said G. W. McLain as collateral se-

curity to the appellant, The German-American Savings Bank, were the property of the said firm of G. W. Mc-Lain and Henry Henrichs; that the same were taken by the bank without authority and in fraud of the rights of such firm and of the plaintiffs, with full knowledge of said facts on the part of the bank; that the same were subject to the attachment liens of the plaintiffs and the lien of the bank was subsequent and inferior thereto; that the same ought to be applied to the satisfaction of their said judgments, which petition concluded with the proper prayer for such relief. The German-American Savings Bank thereupon filed its answer to the said petition, denying the material allegations thereof; alleging that it took the notes in question as collateral security for the money borrowed by G. W. McLain without any knowledge or information that any one else had any interest in them whatsoever; that it purchased one of the notes in question and paid for the same the sum of $2,000 outright, and concluding with a prayer that the proceeds of the notes be held subject first to their lien and applied to the payment thereof; that they recover their costs and for general equitable relief. No answer was filed by G. W. McLain, but Henry Henrichs filed an answer in which he alleges that the notes in question were the property of such firm; that they had been pledged without his knowledge or consent; that they ought to be applied to the satisfaction of the judgments to the exclusion of the rights of the appellant, and that he ought to have the balance of the proceeds of the notes for himself. Upon these issues the case was tried to the court and a decree rendered as follows:

"Said cause coming on to a hearing upon the petitions of the plaintiffs, the answers of the defendants, The German-American Savings Bank of Le Mars and Henry Henrichs, and the reply of the defendant The German-American Savings Bank of Le Mars, Iowa, and the evidence adduced and taken in open court upon the hearing

by and in behalf of the respective parties, and the court being fully advised in the premises, now here finds that all the facts stated in the said petitions of the plaintiffs are true, and that they are entitled to the relief prayed in their said petitions; and that the facts stated in the answer of the defendant Henry Henrichs are true, and that he is entitled to the relief prayed in his said answer; and that the court finds that the defendant The German-American Savings Bank of Le Mars, Iowa, has a first lien upon the notes and securities and the proceeds thereof, described in the pleadings herein, for the sum of $2,800, with eight per cent interest per annum thereon from the 10th of October, A. D. 1890, and is entitled to be first paid this aforesaid sum and interest due out of such proceeds; that the said plaintiffs are entitled to specific liens upon rest and residue of such notes and proceeds for the amount of their said several judgments and claims, with interest thereon from the date of such judgments, as therein provided, in the order of priority alleged and set forth in said petitions; that the plaintiff The First National Bank of Chicago, Illinois, had a specific lien upon such proceeds, by virtue of its attachment and garnishment, but which said action is still pending and undetermined; that after the payment of the aforesaid several sums of money out of the proceeds of such notes, the rest and residue of such proceeds, if any such there be, shall be divided between the defendant Henry Henrichs and the defendant Geo. W. McLain, or his representatives or assigns, in the proportion of $\frac{41}{89}$ to $\frac{48}{89}$, which said last named fractional proportion of such last named residue so belonging to the said George W. McLain, or his assigns, is hereby adjudged to be paid to the defendant The German-American Savings Bank of Le Mars, as its interest may appear. It is, therefore, now here ordered, adjudged, and decreed by the court that James C. Dahlman, the receiver heretofore appointed herein, shall first pay the costs of this suit, taxed at $——,

out of the proceeds of such said notes; that he next pay
out of such proceeds the said sum of $2,800, with eight
per cent interest thereon from the 10th day of October, to
the defendant The German-American Savings Bank of Le
Mars; that he next pay out of such proceeds to the plaint-
iff The Tolerton-Stetson Company the sum of $710.81,
their judgment, together with the sum of $33.58, their
costs expended in obtaining the same, together with inter-
est on the sum of $354.31 thereof at the rate of seven per
cent per annum from the 30th day of January, 1891,
and on $355.30 thereof at the rate of ten per cent per an-
num from said 30th day of January, 1891; that the said
receiver do forthwith, out of the proceeds of said notes, pay
over to the plaintiff James H. Walker the sum of $648.45,
his judgment, and further sum of $18.65, his costs
therein expended, together with interest thereon at the rate
of —— per cent from the 1st day of December, 1890; that
the said receiver do forthwith, out of the proceeds of such
notes, pay over to the J. T. Robinson Notion Company,
the sum of $110.25, its judgment, and the sum of $14.65,
its costs therein expended, together with seven per cent in-
terest thereon from the 22d day of November, 1890; that
the said receiver do retain in his hands, until the further
order of the court, sufficient of such proceeds to pay the
sum of $652.46 claimed by the plaintiff The First National
Bank of Chicago, together with seven per cent interest
thereon, from the 22d day of June, 1890, $50 probable
costs; that the said receiver do forthwith pay over to the
plaintiffs Finch, Van Slick & Co., out of such proceeds,
the sum of $509.21, their judgment, together with their
costs therein expended taxed at $22.83, with interest thereon
at the rate of seven per cent per annum from the 30th day
of January, 1891; that the said receiver do forthwith pay
over to the plaintiff John T. Pirie, out of such proceeds,
the sum of $1,124.16, the total amount of his two judg-
ments, and the further sum of $30, his costs therein ex-

pended, together with interest thereon at the rate of eight
per cent per annum from the 4th day of November, 1890,
on $500, and eight per cent per annum from the 11th day
of November, 1890, on $500, and seven per cent inter-
est from the 11th day of November, 1890, on $124.16;
that the said receiver do forthwith pay over to the
plaintiffs C. M. Henderson & Co., out of such proceeds,
the sum' of $176, their judgment, together with the
sum of $——, their costs therein expended, with interest
thereon from the 30th day of October, 1890; that the said
receiver do forthwith pay over to the plaintiffs C. Cotzian
& Co., out of such proceeds, the sum of $254.74, their
judgment, together with $14.20, their costs expended
therein, with seven per cent interest thereon, from the 8th
day of November, 1890; that the said receiver do forth-
with pay over to the plaintiffs Sweet, Dempster & Co., out
of such proceeds, the sum of $454.60, their judgment, and
the further sum of $31.40, their costs therein expended,
with seven per cent interest thereon from the 9th day of
November, 1890; that the said receiver do forthwith pay
over to said plaintiffs Sprague, Warner & Co., out of such
proceeds, the sum of $291.31, their judgment, together with
the further sum of $11.80, their costs therein expended, with
seven per cent interest thereon from the 1st day of Decem-
ber, 1890; that the said receiver do forthwith pay over to
the plaintiff Leroy Hall the sum of $1,206.90, his judg-
ment, together with the costs thereof taxed at $27.78, with
interest on $687.25 thereof at the rate of seven per cent per
annum from January 30, 1891, and on $519.65 thereof at
the rate of ten per cent per annum from January 30, 1891;
that the said receiver do forthwith pay over to the Loak
Glove Manufacturing Company, one of the creditors of the
firm of G. W. McLain, the sum of $73.25, with seven per
cent interest thereon from December 20, 1890; that if, after
making the payment of the said several sums out of such
proceeds, there shall remain any residue thereof, the said

Tolerton v. McLain.

receiver shall forthwith pay out said residue as follows: $\frac{44}{89}$ thereof to the defendant Henry Henrichs, and $\frac{48}{89}$ thereof to the defendant The German-American Savings Bank of Le Mars; and it is further ordered, adjudged, and decreed by the court that the said receiver do forthwith proceed to collect, by process of law or otherwise, all of the promissory notes and securities mentioned in the pleadings herein as belonging to the firm of G. W. McLain, and to dispose of the proceeds thereof in the order as above decreed, and that if any of said notes or any judgment recovered thereof shall prove to be uncollectible, said receiver is hereby ordered and directed to forthwith advertise and sell the same, after giving such notice of such sale as shall be required by law, and the proceeds of such sale shall be applied as hereinbefore specified."

The principal question in the case is the good faith of the German-American Savings Bank, of Le Mars, Iowa, in taking the notes in question.

Mr. Meyer, the president of the bank, testified as follows:

Q. Now, what was said, the exact agreement between you and George W. McLain, at the time that he deposited these notes as collateral in relation to your holding them for that purpose?

A. When we made the loan Mr. McLain offered these notes as collateral security for all the notes he was owing at the time.

Q. And what was the consideration which you have made to the bank to advance this additional money for McLain and take these collateral notes?

\*      \*      \*      \*      \*      \*      \*

A. The consideration was, that if McLain would leave these notes as collateral security for all of his indebtedness to the bank we would make these additional advances.

Q. Yes, the advances that were made in May and June?

A. In June.

FISHER: Ask him what advances.

A. Those advances made in June.

Q. When was the paper left at your bank by Mr. Mc-Lain?

A. The 28th day of June.

Q. To whom was this payable?

\*          \*          \*          \*          \*          \*          \*

Q. What, if any, notice or knowledge did you have of any claim or interest of any other person in this paper, other than George W. McLain?

A. Had no notice whatever that any other party had the least claim to this paper.

On cross-examination he testified:

Q. You think that he, McLain, told you they were given for the purchase price of the stock of goods at Craw-ford?

A. Yes, sir; I think he told me that.

Q. Did he tell you any of the circumstances as to the sale?

A. He told me how much money was paid and how many notes he had.

Q. What induced him to sell?

A. No, we didn't enter into further conversation, I don't think; don't remember anything about it.

Q. And you knew that they were a portion of the proceeds of the stock of goods at Crawford?

A. Yes, sir.

Q. Now I will ask you to state, Mr. Meyer, if you didn't know that this store, this general merchandise stock at Crawford, was the only business which G. W. McLain had at that place?

Witness: This what?

Q. This stock of goods.

Witness: Oh! the stock of goods at Crawford?

Q. Stock of goods at Crawford. You knew that was all the business he had at that place?

A. That and his cold storage business there.

Q. I will ask you to state, Mr. Meyer, if you were pres-
ent at a conversation in your banking establishment at Le
Mars, Iowa, between George W. McLain and Mr. Hen-
richs, relative to this cold storage business and the incor-
poration of their business?

\*        \*        \*        \*        \*        \*        \*

A. Yes, sir.

Q. You may state what that conversation was?

\*        \*        \*        \*        \*        \*        \*

A. In the month of April, 1890.

Q. What time in the month of April?   Any time to
which you refer by saying that you were present?

A. Yes, I was present at a conversation at that time.

\*        \*        \*        \*        \*        \*        \*

A. Why, we had a general talk about matters and things
about their business, about the cold storage business, and
what it would result in, and what they would make on a
dozen eggs by carrying them from spring until fall, and
about their incorporating and making a kind of incorpora-
tion.

Q. This conversation was engaged in by McLain, Hen-
richs and yourself, was it?

A. Yes, sir.

Q. At that time was there, or did they not rather agree
as to the advisability of mortgaging their stock at Craw-
ford, their stock of merchandise, and getting some money
from you to put into their cold storage business?

\*        \*        \*        \*        \*        \*        \*

A. They talked about borrowing some money.

Q. What security were they going to offer?

A. Well, now, I don't recollect just what security they
were going to offer.

Q. I will ask you to state if they did not discuss the
advisability of their still continuing in the general mer-

chandise business at Crawford, as well as their cold storage business?

\*        \*        \*        \*        \*        \*        \*

A. I think they did.

Q. Was it not suggested in this conversation that they would incorporate the cold storage business and would deposit their stock in the cold storage corporation with you as collateral as advanced by you, the money to be used in the cold storage business, as well as continuing in the general merchandise business?

\*        \*        \*        \*        \*        \*        \*

A. Yes, sir; so far as the mercantile business was concerned, I think there was some talk of that kind.

Q. Was there not some talk at that time of incorporating their cold storage business, and their general merchandise business, under the corporate name of the United States Merchandise Company, and borrowing some money from you, pledging to you all their issues of stock or stock certificates in this corporation.

\*        \*        \*        \*        \*        \*        \*

A. Why, there was some talk of that kind.

Q. Now, you say their business; whose business do you mean by their business?

A. That is something that Mr. McLain and Mr. Henrichs were talking about their going to do in the future, and there was some talk about their incorporating a merchandise business and issuing stock, and they talked more about it, and wanted to know something about what chance there would be in getting a little money on this stock and leave it in the bank, providing they incorporated; providing they changed their business to an incorporation.

Q. Whose business were they going to change?

A. That's something I don't know anything about.

Q. The other stock that they were going to change, whose stock do you mean by that?

Tolerton v. McLain.

A. I did not understand that they were going to incorporate their stock of goods.

Q. You say that that stock of goods that they talked some of organizing?

A. And their cold storage business I am talking about.

Q. And their cold storage stock of goods?

A. I don't know anything about that.

Q. What stock of goods do you refer to when you state that they intended to change their business and incorporate their stock of goods with the cold storage business?

A. Well, I didn't intend to say that they were going to change their stock of goods into a cold storage business. I do not think I said so.

From other portions of his testimony it clearly appears that he knew Henrichs was a partner with McLain in the business at Crawford, although the business was conducted in the name of McLain. He also knew that they had sold out their business to Manning & Gorton; and that the notes he received to secure the personal debts of McLain were in fact partnership property of McLain and Henrichs. This being the case he is not an innocent holder and the rights of the firm creditors were superior to his. It is unnecessary to consider the other questions in the case as this is decisive of the rights of the parties. The judgment appears to be based upon the testimony and is right and is

AFFIRMED.

THE other judges concur.